In re CHARGE TO GRAND JURY.

(District Court, E. D. Georgia. February 7, 1907.)

1. COMMERCE—REGULATION BY CONGRESS—INTERSTATE COMMERCE DEFINED.

"Interstate commerce" comprehends intercourse for the purposes of trade in any and all of its forms, including transportation, purchase, sale, and exchange of commodities between the citizens of different states; and if any commercial transaction reaches an entirety in two or more states, and if the parties dealing with reference to that transaction deal from different states, then the whole transaction is a part of the interstate commerce of the United States, and subject to regulation by Congress under the Constitution.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 10, Commerce, §§ 1–5.]

2. MONOPOLIES—COMBINATIONS IN RESTRAINT OF INTERSTATE COMMERCE.

The essentials of a contract or combination or conspiracy in restraint of trade or commerce among the several states or to monopolize any part of such trade or commerce, inhibited by the Sherman Anti-Trust Law of July 2, 1890, c. 647, 26 Stat. 209 [U. S. Comp. St. 1901, p. 3200], discussed in a charge to a grand jury.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 35, Monopolies, §§ 8–14.]

Alexander Akerman, Asst. Dist. Atty., for the United States.

Samuel B. Adams, George W. Owens, and Walter G. Charlton, for defendants.

SPEER, District Judge. Gentlemen of the Grand Jury: I am informed by the district attorney that the most important matter for your consideration at this term is an alleged violation of what is known

as the "Anti-Trust Law." These laws in the United States are but the evolution of the ancient laws of our law-loving race against those monopolies which oppress the people. Monopolies are equally obnoxious to the philosophy of Thomas Jefferson and of Sir Edward Coke. The shibboleth of the former, "equal rights to all and special privileges to none," is often heard. The latter, some 350 years ago, denounced them in a definition, which may be well considered by modern jurists and modern juries. Said that great English lawyer:

"A monopoly is an institution or allowance to any person or persons, bodies politic or incorporate, of or for the sole buying, selling, making, working, or using anything, whereby any person or persons, bodies politic or corporate, are sought to be constrained of any freedom or liberty that they had before, or hindered in their lawful trade."

A more modern definition of a trust declares it to be "any compact between two or more persons or corporations, affecting any article or commodity of which the public must have a constant supply, the intent and direct tendency of such an arrangement being the creation of a scarcity or the enhancement of the price."

The efforts of the people of this country to protect themselves against the injurious results of such trusts and combinations have lasted now for many years. This is true of constitutional as of statutory law. Modern state Constitutions of Illinois, Arkansas, California, Colorado, Georgia, Massachusetts, Nebraska, Pennsylvania, Texas, and West Virginia have provisions on the general subject. These provisions are usually held to be merely declaratory of the common law; that is, the law of our forefathers which has come down to us from "the time whereof the memory of man runneth not to the contrary." Monopolies first began in a large way to betray their injustice to the masses of the people in the reign of Queen Elizabeth. From the historian Hume we learn that her active reign had given occasion for distinguished services on the part of many of her subjects. Her revenues did not permit her to adequately compensate them. She therefore granted her servants and courtiers the privileges or patents of certain monopolies. These they sold to others, who were thereby enabled to raise commodities to what price they pleased, and to put "invincible restraints upon all commerce, industry, and emulation in the arts." "It is astonishing to consider," said the historian, "the number and importance of those commodities which were thus assigned over to patentees. Currants, salt, iron, powder, cards, calfskins, fells, pouldavies, ox-shin bones, train oil, lists of cloth, potashes, anise seeds, vinegar, seacoals, steel, aqua vitæ, brushes, pots, bottles, saltpeter, lead, accidences, rudiments of grammar, oil, calamine stone, oil of blubber, glasses, paper, starch, tin, sulphur, the silicate of zinc, new drapery, dried pilchards, transportation or iron ordnance, of beer, of horn, of leather, importation of Spanish wool, of Irish yarn: these are but a part of the commodities which had been appropriated to monopolists. When this list was read in the House, a member cried, 'Is not bread in the number?' 'Bread?' said every one with astonishment. 'Yes, I assure you,' replied he. 'If affairs go on at this rate, we shall have bread reduced to a monopoly before next Parliament.'" Had this earnest parliamentarian lived in the present day, he would

have heard much talk of what are termed the "biscuit trust," the "beef trust," the "sugar trust," and perhaps other trusts, which deal with nutritious commodities essential to the health and indeed to the existence, of mankind.

Those monopolists of Elizabeth's time were so exorbitant in their demands that in some places they raised the price of salt from 16 pence a bushel to 14 or 15 shillings. Such high profits naturally begat intruders upon their commerce, and, in order to secure themselves against encroachments, the patentees were armed with high and arbitrary powers from the council, by which they were enabled to oppress the people at pleasure, and to exact money from such as they thought proper to accuse of interfering with their patent. And, while all domestic intercourse was thus restrained, lest any scope should remain for industry, almost every species of foreign commerce was confined to exclusive companies, who bought and sold at any price that they themselves thought proper to offer or exact. It was inevitable that such special privileges should provoke vigorous protest from the representatives of the people in Parliament. Accordingly a bill was proposed by Mr. Lawrence Hyde, entitled "An act for the explanation of the common law in certain cases of letters patent." The term "patent," it must be understood, was there significant of a grant for a monopoly, and did not have the modern signification. Francis Bacon, who afterwards became Lord Verulam and Viscount St. Albans, and not Lord Bacon, as he is generally called, whom Pope declared "the wisest, brightest, meanest, of mankind," made haste to exclaim:

"As to the prerogative royal of the prince, for my own part, I ever allowed of it; and it is such as I hope will never be discussed. The Queen, as she is our sovereign, hath both an enlarging and restraining power. * * * With regard to monopolies and such like cases, the case hath ever been to humble ourselves unto her majesty, and by petition desire to have our grievances remedied, especially when the remedy touched her so nigh in point of prerogative. I say, and I say it again, that we ought not to deal; to judge, or meddle with her majesty's prerogative. I wish, therefore, every man to be careful of this business."

Others spoke warily on the same line, for the imperious character of good Queen Bess was well known. Some men of high courage spoke plainly. Mr. Montague said:

"The matter is good and honest, and I like this manner of proceeding by bill well enough in this matter. The grievances are great, and I would note only unto you thus much, that the last Parliament we proceeded by way of petition, which had no successful effect."

Mr. Francis More said:

"I know the Queen's prerogative is a thing curious to be dealt withal; yet all grievances are not comparable. I cannot utter with my tongue, or conceive with my heart, the great grievances that the town and country, for which I serve, suffereth by some of these monopolies. It bringeth the general profit into a private hand, and the end of all this is beggary and bondage to the subjects. We have a law for the true and faithful currying of leather. There is a patent sets all at liberty, notwithstanding that statute. And to what purpose is it to do anything by act of Parliament, when the Queen will undo the same by her prerogative? Out of the spirit of humiliation, Mr. Speaker, I do speak it, there is no act of hers that has been or is more derogatory to

her own majesty, more odious to the subject, more dangerous to the commonwealth, than the granting of these monopolies."

Mr. Martin, with even higher spirit, declared:

"I do speak for a town that grieves and pines, for a country that groaneth and languisheth, under the burden of monstrous and unconscionable substitutes to the monopolitans of starch, tin, cloth, oil, vinegar, salt and I know not what; nay, what not!

"The principalest commodities, both of my town and country, are engrossed into the hands of these blood-suckers of the commonwealth. If a body, Mr. Speaker, being left blood, be left still languishing without any remedy, how can the good estate of that body still remain? Such is the state of my town and country; the traffic is taken away, the inward and private commodities are taken away, and dare not be used without the license of these monopolitans. If these blood-suckers be still let alone to suck up the best and principalest commodities which the earth there hath given us, what will become of us, from whom the fruits of our own soil and the commodities of our own labor, which, with the sweat of our brows, even up to the knees in mire and dirt, we have labored for, shall be taken by warrant of supreme authority, which the poor subject dare not gainsay."

Notwithstanding the objurgations of her subjects, Elizabeth, by wheedling and cajoling them in a manner not altogether unfeminine, succeeded in maintaining the monopolies in behalf of her favorites, and at the expense of her people. It was not until the reign of her successor, James I, that relief to the people was afforded. In the first Parliament of this King, a Committee of Grievances was appointed, of which Sir Edward Coke was the chairman, and it is doubtless ascribable to the labors of this great lawyer that the English statute was enacted, which to this day stands in all its original vigor among the laws of England. Of this act against monopolies our own anti-trust law is intended to be the equivalent, as affecting all matters to which the legislative and judicial power of the United States may extend. The heart of man to-day is much the same as in the days of Elizabeth and James. The greed and avarice of the powerful sometimes take little thought of the losses they entail on others not so powerful. Not only do such combinations tend to destroy all healthy rivalry and competition among those who purchase or sell the products of the people, but they sometimes little reck the miseries and destitution inflicted on the producers themselves, the stories of whose lives are often told in the short and simple annals of the poor.

Like the Parliament of England, the Congress of the United States has enacted the present laws prohibiting modern combinations in restraint of trade. These are not the result of patents granted by a partial monarch, but they are the outgrowth of far-reaching schemes, planning combinations to seize a suitable occasion to oppress by unlawful compacts the many for the aggrandizement and enrichment of the few. The law finds its authority in the power of Congress granted by the Constitution to regulate commerce with foreign nations and among the several states. "The power to regulate," said Mr. Justice Harlan, in his dissenting opinion, in United States v. E. C. Knight Company, 156 U. S. 20, 15 Sup. Ct. 249, 39 L. Ed. 325, "is the power to prescribe the rule by which the subject regulated is to be governed. It is one that must be exercised, whenever necessary, through the territorial limits of the several states. The power

to make these regulations 'is complete in itself, may be exercised to its utmost extent, and acknowledges no limitations other than are prescribed in the Constitution.' It is plenary because vested in Congress 'as absolutely as it would be in a single government having in its constitution the same restrictions on the exercise of the power as are found in the Constitution of the United States.'"

It may be exercised, said Chief Justice Marshall, in Gibbons v. Ogden, 9 Wheat. (U. S.) 1, 6 L. Ed. 23, "whenever the subject exists." Said Mr. Justice Johnson in the same case:

"The power to regulate commerce carries with it the whole subject, leaving nothing for the state to act upon, and, if there was any one object riding over every other in the adoption of the Constitution, it was to keep commercial intercourse among the states free from all invidious and partial restraints. In all commercial regulations we are one and the same people."

In Robbins v. Shelby Taxing District, 120 U. S. 489, 7 Sup. Ct. 592, 30 L. Ed. 694, Mr. Justice Bradley declared that the United States are but one country, and are and must be subject to one system of regulations in respect to interstate commerce.

In this connection we may well inquire, what is commerce? We are answered in the lucid phraseology of Chief Justice Marshall:

"Commerce, undoubtedly, is traffic, but it is something more: it is intercourse. It does not embrace the completely interior traffic of the respective states—that 'which is carried on between man and man in a state, or between different parts of the same state, and which does not extend to or affect other states'—but it does embrace 'every species of commercial intercourse' between the United States and foreign nations and among the states, and therefore it includes such traffic or trade, buying, selling, and interchange of commodities as directly affects or necessarily involves the interests of the people of the United States. ' "Commerce" as the word is used in the Constitution, is a unit,' and 'cannot stop at the external boundary line of each state, but may be introduced into the interior.' The genius and character of the whole government seems to be that its action is to be applied to all the external concerns of the nation, and to those internal concerns which affect the states generally."

This was the language of the great Chief Justice in the famous case of Gibbons v. Ogden. It is further defined in the county of Mobile v. Kimball, 102 U. S. 691, 26 L. Ed. 238:

"Commerce with foreign countries and among the states, strictly considered, consists in intercourse and traffic, including, in these terms, navigation and the transportation and transit of persons and property, as well as the purchase, sale, and exchange of commodities."

This expression was adopted anew in Gloucester Ferry Company v. Pennsylvania, 114 U. S. 196, 5 Sup. Ct. 826, 29 L. Ed. 158. It follows that interstate commerce does not, therefore, exist in transportation merely. "It includes the purchase and sale of articles that are intended to be transported from one state to another—every species of commercial intercourse among the states and with foreign nations."

A more recent definition is that of Judge Hough of the Southern District of New York in the very recent case of the United States of America against the McAndrews & Forbes Company et al., known as the "Licorice Paste Case." " 'Commerce,' in its simplest·signification, means the exchange of goods, but with the advancing complexity

of civilization it is now certainly significant, not only of exchange, but of the buying and selling of commodities, and especially of the exchange of merchandise on a large scale. It may be said to be trade, traffic, or exchange between different places and communities. Webster's Dictionary, quoted in State v. Indiana, &c., Co., 133 Ind. 69, 32 N. E. 817, 18 L. R. A. 502." So that nowadays, and in the sense in which the word is used in the statement of the law which I shall presently read you, its import or meaning comprehends intercourse for the purposes of trade in all its forms. Welton v. Missouri, 91 U. S. 275, 23 L. Ed. 347. And interstate commerce, therefore, comprehends intercourse for the purposes of trade in any and all of its forms, including transportation, purchase, sale, and exchange of commodities between the citizens of different states. Hopkins v. United States, 171 U. S. 578, 19 Sup. Ct. 40, 43 L. Ed. 290. Therefore, if any commercial transaction reaches an entirety in two or more states, and if the parties dealing with reference to that transaction deal from different states, then the whole transaction is a part of the interstate commerce of the United States. United States v. Swift (C. C.) 122 Fed. 529.

Now what is the law which Congress has enacted for the purpose of protecting this commerce thus defined from the injurious operations of illegal and unlawful combinations in restraint of it? We find that Congress passed the act approved July 2, 1890, entitled "An act to protect trade and commerce against unlawful restraints and monopolies," commonly known as the "Sherman Anti-Trust Law," the parts of which, important for our consideration here, are as follows:

"Section 1. Every contract or combination in the form of a trust or otherwise, or conspiracy in restraint of trade or commerce among the several states, or with foreign nations, is hereby declared to be illegal. Every person who shall make any such contract or engage in any such combination or conspiracy shall be deemed guilty of a misdemeanor and any conviction thereof shall be punished by fine not exceeding $5,000, or by imprisonment not exceeding one year, or by both said punishments in the discretion of the court.

"Sec. 2. Every person who shall monopolize or attempt to monopolize, or combine or conspire to monopolize any part of the trade or commerce among the several states or with foreign nations, shall be deemed guilty of a misdemeanor, and any conviction thereof shall be punished by fine not exceeding $5,000 or by imprisonment not exceeding one year, or by both said punishments in the discretion of the court."

Act July 2, 1890, c. 647, 26 Stat. 209 [U. S. Comp. St. 1901, p. 3200].

The first efficient case in which a full analysis of the law was given by the Supreme Court of the United States was that of United States v. Freight Association, 166 U. S. 323, 17 Sup. Ct. 540, 41 L. Ed. 1007. This is properly called the "Trans-Missouri Case." It was there held that the prohibitory provisions of the act of July 2, 1890, namely the "Anti-Trust Act," applied to all contracts in restraint of interstate and foreign trade or commerce, without exception or limitation, and are not confined to those in which the restraint is unreasonable. It was also held that, in order to maintain its case, "the government is not obliged to show that the agreement in question was entered into for the purpose of restraining trade or commerce, if such restraint is its necessary effect." A comprehensive view of the law may be found

in the latter case, in the language of Mr. Justice Peckham, to which I invoke your special attention:

"It is wholly different, however, when such changes are effected by combinations of capital, whose purpose in combining is to control the production or manufacture of any particular article in the market, and by such control dictate the price at which the article shall be sold, the effect being to drive out of business all the small dealers in the commodity, and to render the public subject to the decision of the combination as to what price shall be paid for the article. In this light it is not material that the price of an article may be lowered.

"It is in the power of the combination to raise it, and the result in any event is unfortunate for the country by depriving it of the services of a large number of small but independent dealers who were familiar with the business and who had spent their lives in it, and who supported themselves and their families from the small profits realized therein.

"Whether they be able to find other avenues to earn their livelihood is not so material, because it is not for the real prosperity of any country that such changes should occur which result in transferring an independent business man, the head of his establishment, small though it might be, into a mere servant or agent of a corporation for selling the commodities which he once manufactured or dealt in, having no voice in shaping the business policy of the company, and bound to obey orders issued by others. Nor is it for the substantial interests of the country that any one commodity should be within the sole power and subject to the sole will of one powerful combination of capital. Congress has, so far as its jurisdiction extends, prohibited all contracts or combinations in the form of trusts entered into for the purpose of restraining trade and commerce. The results naturally flowing from a contract or combination in restraint of trade or commerce, when entered into by a manufacturing or trading company such as above stated, while differing somewhat from those which may follow a contract to keep up transportation rates by railroads, are nevertheless of the same nature and kind, and the contracts themselves do not so far differ in their nature that they may not all be treated alike and be condemned in common."

The next important deliverance upon this subject may be found in the case of United States v. Traffic Association, 171 U. S. 505, 19 Sup. Ct. 25, 43 L. Ed. 259. There railroad companies formed themselves into an association known as the "Joint Traffic Association." They agreed that they should have jurisdiction over all competitive traffic, with certain exceptions; that they were to fix rates, fares, and charges, and from time to time change the same. No party to the agreement was to be permitted to deviate from or change those rates, fares, or charges, and its action in that respect was not to affect rates disapproved, except to the extent of its interest therein over its own road. They expressly agreed that they would not permit a violation of the interstate commerce act. They also agreed that the managers should co-operate with the Interstate Commerce Commission to secure stability and uniformity in rates, fares, charges, etc. The managers were given power to decide and enforce the course which should be pursued with connecting companies, not parties to the agreement, which declined or failed to observe the established rates. Assessments were made, and the agreement was to continue for five years.

Notwithstanding the profuse assurances upon the part of these railroad gentlemen that they would co-operate with the Interstate Commerce Commission, the Supreme Court of the United States declared their combination and agreement void. In this, as in the Trans-Missouri Case, the greatest lawyers in the country were retained

for the railroads. Mr. J. C. Carter argued for the Joint Traffic Association, the renowned Edward J. Phelps for the New York Central & Hudson River Railroad, and the Hon. George F. Edmunds, clarum et venerabile nomen, for the Pennsylvania Railroad Company. It is perhaps safe to say that no greater and more experienced lawyers ever appeared before an American court. The then Solicitor General appeared for the government. The court, after the most elaborate inquiry and careful consideration, reaffirmed its conclusions in the Trans-Missouri Case.

In Addyston Pipe & Steel Co. v. United States, 175 U. S. 240, 20 Sup. Ct. 96, 44 L. Ed. 136, this great statute against modern monopolies again came under review. There the ruling of the court below was made by Circuit Judge Taft. The case involved a combination to control the manufacture and sale and transportation of iron pipe. Said Justice Peckham for the court:

"While no particular contract regarding the furnishing of pipe or the price for which it was furnished was in the contemplation of the parties to the combination at the time of its formation, yet it was their intention, as it was the purpose of the combination, to directly and by means of such combination increase the price for which all contracts for the delivery of pipe within the territory above described should be made, and the latter result was to be achieved by abolishing all competition between the parties to the combination. The direct and immediate result of the combination was therefore necessarily a restraint upon interstate commerce in respect to articles manufactured by any of the parties to it to be transported beyond the state in which they were made. The defendants, by reason of the combination and agreement, could only send their goods out of the state in which they were manufactured for sale and delivery in another state upon the terms and pursuant to the provisions of such combination."

The court held that this was a combination in restraint of trade, and, to the extent to which interstate transactions were involved, the judgment of the court below was affirmed. On the constitutional question the court held that Congress may enact such legislation as shall declare void and prohibitive the provisions of any contract between individuals or corporations where the natural and direct effect of such contracts shall be, when carried out, directly, and not as a mere incident to other and innocent purposes, to affect to any extent interstate or foreign commerce. An association was formed in California by the manufacturers and dealers in tiles, mantles, and grates. The dealers agreed not to purchase material from manufacturers who were not members of the association, and not to sell unset tile to nonmembers for less than list prices, which were 50 per cent. higher than prices to members, and all manufacturers who were residents of states other than California agreed not to sell to any one other than members. Violations of the agreement rendered the member subject to forfeiture of membership. Each member was required to carry $3,000 worth of stock. Whether applicants were to be admitted was a matter for the arbitrary decision of the association. A firm of dealers in tiles, mantels, and grates in San Francisco who had not sought or been asked to join the association, and did not carry $3,000 of its stock, brought an action to recover damages under paragraph 7 of the anti-trust act of July 2, 1890, namely, the act under consideration (26 Stat. 210 [U. S. Comp. St. 1901, p. 3202]). The court held that although the sales

of unset tiles were within the state of California, and although such sales constituted a very small portion of the contract involved, the agreement of the manufacturers without the state not to sell to any one but members was part of a scheme which included the enhancement of the price of the unset tile by the dealers within the state, and that the whole matter was so bound together that the transactions within the state were inseparable and became 'a part of a purpose which, when carried out, was a combination in restraint of interstate trade or commerce. They held furthermore that the association constituted and amounted to an agreement or combination in restraint of trade within the meaning of the act of July 2, 1890, and that the parties aggrieved were entitled to recover threefold damages found by the jury.

In the case of Swift Co. v. United States, printed in 196 U. S. 375, 25 Sup. Ct. 276, 49 L. Ed. 518, and decided January 30, 1905, the court gives its attention to combinations in restraint of trade among the dealers in fresh meat throughout the United States. It is aimed at what is called the "beef trust," and declares that a combination of a dominant proportion of the dealers in fresh meat throughout the United States not to bid against each other in the live stock markets of the different states, to bid up prices for a few days in order to induce shipments to the stockyards, to fix selling prices, and to that end to restrict shipments of meat when necessary, to establish a uniform rule of credit to dealers, and to keep a blacklist, to make uniform and improper charges for cartage, to secure less than lawful freight rates to the exclusion of competitors, with intent to monopoly, is an illegal combination within the meaning and prohibition of the act of July 2, 1890, and can be restrained and enjoined in an action by the United States. The court goes further and holds that it does not matter that the combination of this nature embraces a restraint and monopoly of trade within a single state, if it also embraces and is directed against commerce among the states. It, however, declared that the effect upon interstate commerce is direct and not incidental. It further holds that if a principal element of such a scheme were lawful, and the participants are bound by a common intent as part of the unlawful scheme to monopolize interstate commerce, the balance may make the parts unlawful. To illustrate, they hold that when cattle are sent for sale from a place in one state, with the expectation that they will end their transit, after purchase, in another, and when in effect they do so, with only the interruption necessary to find a purchaser at the stockyards, and when this is a typical, constantly recurring course, it constitutes interstate commerce, and the purchase of cattle is an incident of such commerce.

In the famous Northern Securities Co. Case, 193 U. S. 197, 24 Sup. Ct. 436, 48 L. Ed. 679, the following facts were developed: A holding corporation was formed called the "Northern Securities Company." It became the custodian of more than nine-tenths of the stock of the Northern Pacific, and more than three-fourths of the stock of the Great Northern. These were competitive lines. The stockholders of the companies who delivered their stock received upon similar conditions shares of stock in the holding corporation. The court held that the constituent companies ceased under this arrangement to be

in active competition for trade and commerce along their respective lines, and became practically one powerful, consolidated corporation by the name of the holding company, the principal, if not the sole, object of which was to carry out the purpose of the original combination under which competition between the constituent companies would cease. It was held to be an illegal combination in violation of the anti-trust law, and that it was within the power of the Circuit Court to enjoin the holding company from voting such stock and from exercising any control whatever over the acts and control of the railroad companies, and also to enjoin the railroad from paying any dividends to the holding corporation on any of their stock held by it. "If," said that renowned and venerable American jurist, Mr. Justice Harlan, ever insistent to protect the rights of those who cannot help themselves, "the anti-trust law is held not to embrace a case such as that now before us, the plain intention of the legislative branch of the government would be defeated. If Congress has not by the words used in the act described this and like cases, it would, we apprehend, be impossible to find words that would describe them."

Cases of this general character have been and are of immense consequence to the American people. A large number of cases involving these principles are pending elsewhere in the United States. The law has been of force for 17 years. Its constitutionality has been settled in the great case of United States v. Joint Traffic Association, 171 U. S. 505, 19 Sup. Ct. 25, 43 L. Ed. 259. A large number of cases have been decided in which such combinations and trusts have been restrained because in violation of the law.

A case of this sort is Swift Co. and Others v. United States, already referred to. There a combination between individuals and corporations engaged in the business of purchasing live stock, converting it into fresh meat, and selling the products in interstate commerce, whereby competition both in purchasing live stock and the sale of the meat was suppressed, was declared unlawful by the Supreme Court of the United States.

The same result happened in the case of General Paper Company v. United States (U. S.) 26 Sup. Ct. 356, 50 L. Ed. 686; in United States against the Nome Retail Grocers' Association, in far Alaska; in the case of the United States against the Otis Elevator Company; in the United States against the Federal Salt Company. An indictment was also had against the salt company. Under the penal clauses of the law they were found guilty and sentenced to pay a fine of $1,000. A great many similar cases are now pending in the various states and territories. All these, and many others of equal or greater interest, appear in the latest report of the Attorney General to the Congress of the United States.

An illustration of the vital significance of this law may be found in the case of Tift et al. v. Southern Railway Co. et al. (recently decided by this court) 138 Fed. 753. There, as in the Trans-Missouri Case, it was in effect held that a combination to control the rates of a number of railroad companies, called the "Southeastern Tariff Association," was a combination in restraint of trade. Pursuant to the deliberations of that body, they had made an advance of 2

cents per 100 pounds on all lumber shipped from this section to Ohio river points and points beyond in car load lots. As this is a Georgia case, it will perhaps be justifiable to quote a brief extract from the opinion of the court:

"They have no right, to graduate their charges in proportion to the prosperity which comes to industries whose products they transport. With equal reason they might demand an increase of rates for the transportation of cotton with every increase in the value of our great staple. Indeed, to concede the principle for the fixation of rates upon which the railroads, through the medium of the Southeastern Freight Association, have acted in this case, would concede their power to levy for no better service augmentation of tolls for every increase of profit in every line of endeavor won by the enterprise, sagacity, and industry of the American people. It is superfluous to add that a government of law and not of men will never tolerate such domination and control of the trade, manufacture, and commerce of the American people. These views relate exclusively to the facts before the court in this case, as proven incontestably by the evidence, and as found by the Interstate Commerce Commission. Here is no attempt to discredit the incalculable services which are hourly rendered the country by the railways. In nothing do we share the animus or purposes of that sinister, selfish, and insincere agitation which would excite, if it could, the masses of the people to hatred and injustice toward corporations. Such a propaganda provokes in the justly balanced mind, and particularly in the mind trained for the administration of law and for the protection of property and personal rights, disapprobation, and, indeed, abhorrence.

"With sincere enthusiasm the judge of this court has elsewhere testified to the wonderful material blessings bestowed upon our once prostrate Southland by our great railway systems. In 'economies of operation; in constant, if gradual, reduction of rates; in increased facilities and more expensive accommodations; in more uniform service for longer distances without change of cars; in abolition of short, disjointed lines under different management; in augmentation of shipping facilities; in physical perfection of the properties, and consequent safety to the public; in the steady increase in value of all the securities of these great highways of Southern commerce. * * * And with what result?

"Where formerly asthmatic engines attached to unsafe and noisome trains, through the solitudes of an impoverished country, like a wounded snake dragged their slow length along, now we behold, on massive rails of gleaming steel, on roadbeds of granitic ballast, successive sections of long freight trains sturdily steaming through a prosperous land smiling with luxuriant crops, beautiful with neat and happy homes, the chimneys of great factories giving employment to thousands, almost marking the miles; or the admiration kindles and the pulse leaps as the limited express, laden with its human freight, glances by on its mission of progress and civilization.

"In nothing do we abate that enthusiastic approval of the services of the railways to the people, but not more than any other human agency is railroad management infallible."

Can it be that such eulogium, earnestly spoken, will be made a travesty of the facts by a shortsighted, sinister, and criminal policy, which ignores rotting cross-ties and quivering roadbeds, which places the adolescent, the ignorant, the indifferent, and the underpaid at the telegraph key, which recks not the daily story of colliding or derailed trains, flaming engines, of murdered and mangled passengers, of brave engineers and trainmen, officials of every rank, crushed into bleeding shapes or burned to cinders—a policy whose shibboleth is that of "damned Iago": "Put money in thy purse." "Go, get money."

The patriotic and proper solution of every controversy, involving the vast questions of combination in restraint of trade, of trusts and

transportation, is simply the trial of each case on its particular facts, and with an eye single to the merits of the one party or the other. In interstate commerce this is exclusively a duty of the national tribunals, and the laws regulating such commerce are within the exclusive power of Congress, and within the control of a fearless and clear-eyed people who, as Emerson said, "whether James or Jonathan sits in the chair and holds the purse" with their common sense, will conserve the safety of our country.

The inquiry to which your attention will be directed, as I am officially informed, will not, like the Tift Case (known as the "Lumber Rate Case"), involve interstate and foreign commerce in lumber. I am informed by the district attorney that it will relate to the kindred products of turpentine and rosin, commonly known as "naval stores." These products are of immense value to the people of this and adjacent states. Nor does it appear, notwithstanding predictions to the contrary, that the great natural resources found in the pine forests of Georgia, Florida, and other southern states are about to disappear. It cannot be doubted that with judicious forestry laws and careful attention on the part of the people the pine forests will in a large measure regain their pristine vigor and value. The port of Savannah is believed to be the greatest port for the export and handling of naval stores in the world, and its people, like those of every state from North Carolina to Texas, and the consumers everywhere, should be deeply interested in your inquiry.

You will ascertain then, gentlemen, from the evidence, oral or otherwise, whether there are those who, within the jurisdiction of this court, have entered into contracts or combinations, in the form of trusts or otherwise, or conspiracies, in restraint of trade or commerce among the several states or with foreign nations. You will inquire whether there are those who have monopolized or attempted to monopolize, or combined or conspired with any person or persons to monopolize, any part of the trade or commerce among the states or with foreign nations. I charge you that the word "person" or "persons" in this connection imports corporations also. If you are the men the law presumes you to be, and which I am sure you are, you will permit nothing but the law, the evidence, and your consciences to control your action.

.You will have other grave duties to perform, involving other laws enacted to protect and promote the business, welfare, and happiness and security of our people, in so far as that is within the jurisdiction intrusted to you. The assistant attorneys will be your legal advisers, and you can rely on their interpretation and construction of the law. The court will, on occasion, afford you any assistance in its power.

Grave as are the interests of the people intrusted to your care—for the government and the people are powerless in the lack of your duty well performed—to you the matter of gravest moment and most lasting import is the effect of your conduct, in the presence of these mighty issues of public law, upon the strength and elevation of character, conscience, and citizenship. I adjure you in familiar words, "Let all the ends thou aimest at be thy country's, thy God's, and truth's." To each grand juryman will I confidently say, "To thine own self be

true; and it must follow as night the day, thou canst not then be false to any man."

NOTE.—The grand jury, to whom this charge was made, presented indictments against a number of parties and corporations, and the principal defendants, on arraignment, having pleaded guilty, the court imposed fines, amounting in the aggregate to $30,000; and, accepting the assurance of the accused that they would not again violate the laws against combinations in restraint of trade, no other or further penalty was imposed.