## PEDRO PASTOR

### v.

## NEW YORK & PORTO RICO STEAMSHIP CO. ET AL.

Ponce, Law, No. 218.

1. The Sherman anti-trust act of July 2, 1890 (26 Stat at L. 209, chap.

647, U. S. Comp. Stat. 1901, p. 3200), is applicable to Porto Rico and can be enforced by the district court of the United States for Porto Rico.

2. A steamship company may, as part of its through freightage line, legally contract with one company of lightermen to the exclusion of others.

3. A trust or monopoly which injures "the public" may be prosecuted by the government by indictment, or, civilly, by a bill for an injunction, whereas for an injury to the business of persons an action may be filed under § 7 of said act.

4. A private individual cannot invoke said law to correct an injury "to the public."

Opinion filed June 1, 1907.

_Mr. C. M. Boerman,_ attorney for plaintiff.

_Messrs. Pettingill & Leake,_ attorneys for defendants.

RODEY, Judge, delivered the following opinion:

This is an action brought by the plaintiff, who is a resident of Ponce, Porto Rico, under the act of Congress commonly called the Sherman anti-trust act of July 2, 1890 (26 Stat. at L. 209, chap. 647, U. S. Comp. Stat. 1901, p. 3200), to recover the sum of $45,000 as triple damages under the terms of the act.

The steamship company is engaged in transporting freight and passengers to and fro between Porto Rico and New York and Porto Rico and New Orleans. There are really but two defendants, the steamship company and the Commercial Lighter Company, although the latter, it seems, is a firm and consists of several individuals who are also named as defendants. Both defendants, by different counsel, demur separately, on the ground, among several others, that the facts alleged in the complaint do not constitute a cause of action, much less a violation of the act of Congress referred to, and, further, because the com-

Pastor v. New York & P. R. Steamship Co.

plaint does not show any injury to plaintiff of a character for which he can recover damages from these defendants. The lighter company also answers and denies the allegations of the complaint *in toto,* and alleges that it, the said lighter company, was dissolved by mutual consent in September, 1906, and its property divided among the several owners.

Although the complaint is somewhat oddly worded, we gather from it that the facts are about as follows:

That previous to the committing of the alleged grievances complained of, plaintiff and defendant lighter company, the latter either in its present form, or in the names of the several individuals now composing it, and others, were the owners of certain launches, towboats, and lighters in the bay at Ponce, Porto Rico, and were competitors for the business of lightering freight to and from the ships of the defendant and those of all other owners or steamship companies between the anchorage in the bay and the warehouses of the shipowners or consignees on the wharf; that on or about the 16th of May, 1904, all of the defendants entered into a contract or agreement which plaintiff alleges is "a contract or combination in the form of a trust in restraint of trade and commerce," and that under it they agreed between themselves that thereafter the defendant steamship company would not accept any shipments of freight from New York to Ponce or *vice versa,* or from New Orleans to Ponce or *vice versa,* from any such person in such places save on the condition that such merchandise should be transported to and from said steamship company's steamers in said bay of Ponce in the lighters of the other defendant, the Commercial Lighter Company, thus excluding the plaintiff and all other owners of lighters, towboats, or launches from participating in the said lighterage business in so far as the ships of the defendant steam-

III. PORTO RICO—7.

ship company are concerned. That they then also agreed upon
certain fixed prices to be charged shippers for such lighterage
service, and that this has resulted "in great damage and injury
to the public." It is further alleged that this arrangement has
resulted in a monopoly by said defendants of said lighterage
business in so far as defendant steamship company's ships are
concerned. That on said date the defendant steamship company
notified plaintiff that it would thereafter exclude his launches,
towboats, and lighters from access to its vessels in the bay at
Ponce, and that they have ever since so denied such access to
him.

That plaintiff, since the year 1903, has been engaged in this
lighterage business in said harbor of Ponce, and that because
of this combination and monopoly between these defendants he
has been injured in his business and deprived of the same to the
extent of $5,000 per annum, beginning on the 16th day of May,
1904, and continuing to date. That he is informed and believes
that recently the defendants composing the said Commercial
Lighter Company have transferred their interests in said monop-
oly to one Guillermo Cortada, who is also named as a defendant,
and that the latter is carrying out the said illegal agreement;
but that, as to this, plaintiff has no exact knowledge, etc.

The demurrer of the defendant steamship company contains
nine specific grounds of demurrer, but the first and last, al-
leging respectively that this is not a circuit court of the United
States upon which the act of Congress in question, by its terms,
conferred jurisdiction, and that the act of Congress in question
has not, in fact, been made applicable in Porto Rico, are, we
presume, and in fact counsel so states in his brief, inserted *pro
forma,* to save the points on appeal should that be necessary, be-
cause we have heretofore decided these points against the con-

tention here made, in the case of Peck S. S. Line v. New York & P. R. S. S. Co. 2 Porto Rico Fed. Rep. 109. It may not be out of place to point out here that in the case just referred to the acts which the Peck Steamship Line complained of were that the defendant steamship company, while having ample dock for its own use, conspired with the American Railroad Company to shut the plaintiff out from the use of the only public dock situated in the harbor of San Juan, contrary to existing law, and with a view to preventing the plaintiff steamship company from successfully competing in the freight business with this defendant company between New York and Porto Rico. The cases are not at all parallel, and we think we properly overruled the demurrer in the former case.

In the view we take of this present case it would not be profitable to consider in detail the other seven grounds of demurrer filed by the defendant steamship company, because we feel that the only real point in the case can be passed upon under the general ground of demurrer filed by both defendants.

It seems to us that the real question in the case is, Can the defendant steamship company enter into a contract or agreement with defendant lighter company, so as to complete its through freight line, to receive or discharge at Ponce all the freight it carries to or from New York and New Orleans in the latter company's lighters, even though this results, to some extent, in a monopoly of the business, and even though the defendants do agree among themselves upon the charges to be made to shippers for such lighterage service as a part of the through freight charges, or must the defendant steamship company, forsooth, because it finds this plaintiff the owner of launches, towboats, and lighters, and engaged in that business there, continue to give him business and afford him and all other persons hap-

pening to be owners of such facilities and engaged in such **busi-ness** access to its ships whether it considers them responsible persons or not, and without reference to whether that results in inconvenience to itself and its patrons? It seems to us'that the defendant steamship company can make this sort of agreement as a part of its through freightage line. Surely no one would deny that it might own its own lighters and receive and deliver its own freight on its own vessels at said harbor without reference to any independent lighter firm or company. Then how can it be said that it is deprived of the right to enter into an arrangement of this kind with any other person or concern to do it for them?

It appears to us that it would be unreasonable to contend that the act of Congress in question, or any other act of Congress, prohibits the defendant steamship company from exercising this ordinary business right. We have hurriedly examined practically all the great cases decided by the courts of the United States under this anti-trust act since the date of its passage to the present time, and we are free to say that none of them, in our opinion, go to the extent of holding that this sort of an arrangement would be unlawful. It may be said, and it is quite conceivable, that in cases where but one steamship line was entering a harbor, this sort of an agreement might result in an absolute monopoly; and if the charges made for such lighterage service as a part of the continuous freightage line should be unreasonably high, it would result in damage to the public. But the question suggests itself, Is not this a matter which the government itself, under the very terms of this act, is the proper authority to correct? In fact, it would seem that it is the general concensus of opinion in the nation that the correction of trust and monopolistic evils is, under the act in question,

Pastor v. New York & P. R. Steamship Co.

peculiarly the province of the Department of Justice of the United States, through its Attorney General and the several district attorneys throughout the nation, with the right remaining, of course, to outsiders who come fairly within the purview of § 7 of the act to sue for injury to their business or property.

The report of the Attorney General of the United States to Congress for the year 1906, pages 6 to 22, inclusive, sets forth a concise statement of the different prosecutions that have been brought by the national government against violators of this anti-trust act up to the present time, and gives a succinct *résumé* of the character of the several violations and of the rulings made by the Supreme Court of the United States in the several cases finally passed upon. It will be seen from this exposition of the matter that the sort of injury to the public which, as we see it, is alleged to exist in the present case, is usually prosecuted on indictment, and, in other instances, under bills in equity, is enjoined directly by the government itself; and that the sort of injury contemplated by § 7 of the act to business or property for which outsiders can sue is usually direct injury to shippers, users, or consignees.

A couple of months ago Judge Speer of the district court for the eastern district of Georgia (151 Fed. 834), when charging a grand jury that was about to consider alleged violations of this particular act of Congress in that district, took occasion to make an elaborate review of the matter and to comment upon the purposes of the act of Congress. None of the comments he makes or the cases he refers to, exhaustive though his charge is, throw any light upon the peculiar state of facts we are considering here, and it would seem that this sort of a case is so outside the purview of the act, that but few attempts have been made to assert a right to damages under such facts.

In our investigations we have examined rather hastily a good many of the cases decided under this act and the interstate commerce act, by the Supreme Court of the United States, and cannot find that they so hold that plaintiff here would be entitled to file this suit.   See United States v. E. C. Knight Co. 156 U. S. 1, 39 L. ed. 325, 15 Sup. Ct. Rep. 249; United States v. Trans-Missouri Freight Asso. 166 U. S. 290, 41 L. ed. 1007, 17 Sup. Ct. Rep. 540; United States v. Joint Traffic Asso. 171 U. S. 505, 43 L. ed. 259, 19 Sup. Ct. Rep. 25; Hopkins v. United States, 171 U. S. 579, 43 L. ed. 291, 19 Sup. Ct. Rep. 40; Addyston Pipe & Steel Co. v. United States, 175 U. S. 211, 44 L. ed. 136, 20 Sup. Ct. Rep. 96; W. W. Montague & Co. v. Lowry, 193 U. S. 38, 48 L. ed. 608, 24 Sup. Ct. Rep. 307; Northern Securities Co. v. United States, 193 U. S. 197, 48 L. ed. 679, 24 Sup. Ct. Rep. 436; Minnesota v. Northern Securities Co. 194 U. S. 48, 48 L. ed. 870, 24 Sup. Ct. Rep. 598; Swift & Co. v. United States, 196 U. S. 375, 49 L. ed. 518, 25 Sup. Ct. Rep. 276; National Cotton Oil Co. v. Texas, 197 U. S. 115, 49 L. ed. 689, 25 Sup. Ct. Rep. 379; and Cincinnati, P. B. S. & P. Packet Co. v. Bay, 200 U. S. 179, 50 L. ed. 428, 26 Sup. Ct. Rep. 208. See also 7 Fed. Stat. Anno. pp. 336 et seq.

A case that comes nearer to the one at bar in analogous facts than any other we have been able to find is that of Prescott & A. C. R. Co. v. Atchison, T. & S. F. R. Co. 73 Fed. 438.   There was a good deal more litigation over that cause of action, as we recollect, than is set up in the report here referred to, but we have not the Arizona reports at hand, and so are not enabled to quote from them.   We know that this is so, because the present incumbent of this bench, as a resident of New Mexico for many years, had personal knowledge of the facts and occurrences,

culminating in that litigation. In fact, it was current history in New Mexico and Arizona for many years. We can state the facts better from our own personal recollection of them than they are given in the report referred to. Some twenty-five years ago, under an act of Congress, the Atlantic & Pacific trunk line of railway was built from Albuquerque in central New Mexico westward to the Arizona line, and through the northern portion of that territory westward to California and the Pacific coast. There was no railway communication from that main line southward in central Arizona to Prescott, Phœnix, and other places. Certain parties built this Prescott & Arizona Central Ry., running from a point on this northern trunk line, south, towards Prescott and Phœnix, as we recollect it. Then some dispute arose between the parties who built this comparatively short cross branch line and the main trunk lines north and south of it. This dispute resulted in the trunk lines, or one or more of them, through subsidiary companies or otherwise, building a parallel branch cross line but a few miles away from this older cross line. When the new cross line was finished, the trunk lines at once entered into an exclusive freight and passenger arrangement with it, and delivered all their through freight and passengers to it, and received all of its freight and passenger business in exchange, thus ruining the older cross line. An immense amount of fruitless litigation over the matter ensued, the principal owners of the first cross line endeavoring in all sorts of ways to collect damages for the building of the second line and the ruining of their business and property. The case above referred to is but a small part of the litigation, and shows that no cause of action existed. Our personal recollection is that the rolling stock of the first line was sold, the steel was taken up, and as many of the ties as could be were re-

moved and sold, and the road was completely discontinued, its grade, station buildings, and other property going to rack and ruin. It naturally suggests itself that this was a case where the plaintiff would appear to have infinitely more right than in such a case as this, yet the courts held that none existed. It is true that Judge Lacombe's opinion in the Prescott & Arizona Central Case above referred to is not a very elaborate one, and that he states that it is based upon the Trans-Missouri Freight Association Case and two others which had just been decided in circuit courts, and the first of which, at least, was afterwards reversed by the Supreme Court of the United States, and that he acknowledges in the opinion, on the bottom of page 439, that he had held the contrary doctrine in a previous case, but he gives reasons for distinguishing the former ruling, and gives such sound reasons for the holding he makes in the case he was then considering that we feel constrained to consider his decision is a good one, especially as we do not find that the Supreme Court of the United States has ever passed upon a case involving similar facts.

When we consider the position of the plaintiff here, it seems to us that he is not even in as good a position as the owner of a hack would be in a city, were such a person the plaintiff in a similar suit. The hack owner would have a fundamental right to deliver passengers, or receive passengers from a common-carrier railroad at any station, because, for his purposes, the station to which he drives his hack would be the terminus or the beginning of the railroad, and he would be an independent carrier in common with others from and to the station. Here the defendant steamship company's line does not end in the bay of Ponce, but its through freightage duties end only in its warehouse on the wharf, or on the wharf itself. No consignee

is bound to send a boat out in the bay to its vessels to receive freight. In a recent case of that kind which we tried in this court we held that the defendant steamship company was bound to safely deliver merchandise to the consignee on the wharf at Ponce, under the terms of its bill of lading. It would therefore be ridiculous, we submit, to hold that the steamship company cannot select any one of several lighter companies from whom alone it will receive and to whom alone it will deliver the freight of shippers over its own line. Of course, such lighter company must be present on the wharf, or must keep a warehouse there where the shipping public can deliver merchandise. In our opinion, it would be depriving the defendant steamship company of its ordinary and fundamental right of contract to say that it must receive from and deliver freight to any person, firm, or corporation out in the bay, simply because they happen to own lighter boats. The defendant steamship company is liable for loss and damage to the freight it carries, and it ought to be permitted to select as its agent people who, in its opinion, are honest, careful, and responsible for that purpose, and who can give it proper security for the faithful performance of the duties devolving upon them.

It may be that if a shipper of freight, and not a mere lighter-boat owner, was plaintiff in this case, his position might be better; but we cannot see how this plaintiff has any remedy under the act of Congress in question, even though he may in fact have been injured as a consequence of the acts of the defendants. It is, in our opinion, simply a case of *injuria absque damno*. The demurrer, will, therefor, be sustained with costs, and the complaint dismissed, and it is so ordered.